**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **VALLEY AIR SERVICE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **06 C 782** |
| | ) | |
| **SOUTHAIRE, INC., et al.,** | ) | |
| **Defendants,** | ) | |

**MEMORANDUM AND ORDER**

Valley Air Service contracted with Southaire to purchase an airplane which was to be repaired, refurbished, and customized by Central Flying Service pursuant to a contract between Central Flying and Southaire. Contending that the plane was a lemon and that it was defrauded into making fruitless repairs, Valley Air Service sued Southaire, Edward Brunner (Southaire's President), Central Flying Service and William Englert (Central Flying's Director of Light Jet Maintenance). Southaire and Brunner as well as Central Flying and Englert have each filed motions for summary judgment. For the following reasons, the following counts will be tried: Count I (breach of contract against Southaire), Count II (common law fraud against Southaire and Brunner), and Count VI (common law fraud against Central Flying and Englert).

**I.      Background**

The following facts[1] are drawn from the parties' Local Rule 56.1 statements.[2]  Because

---

[1]  The court will disregard legal conclusions in Valley Air's responses to the defendants' statement of facts.

[2]  The court notes that Central Flying submitted exhibits in support of the defendants' joint statement of facts, and then Central Flying, Southaire, and Valley Air all submitted additional exhibits, many of which overlap. The parties' practice of attaching portions of the same documents as different exhibits to their own filings creates unnecessary complexity in the

the defendants elected not to respond to Valley Air's statement of additional facts, except to say that they believe that all of these facts are irrelevant to the issues presently before the court, those facts are deemed admitted for purposes of the motions for summary judgment. *See* Local Rule 56.1(b)(3)(C).

### A.    Jurisdiction and Venue

Plaintiff Valley Air Service is an Illinois corporation with its principal place of business in Illinois.[3]  Defendant Southaire, Inc. is a Tennessee corporation with its principal place of business in Tennessee.  Defendant Central Flying Service, Inc. is an Arkansas corporation with its principal place of business in Arkansas.  Central Flying is not registered to do business in Illinois.  Edward Brunner (Southaire's President) is a Tennessee citizen, and William Englert (Central Flying's Director of Light Jet Maintenance) is an Arkansas citizen.  It is undisputed that Valley Air Service seeks well over $75,000 in damages in connection with the plane, which cost approximately $2M.

---

record.  For example, when responding to the portions of the defendants' statement of facts addressing Central Flying's Exhibit A, Valley Air disputes the defendants' characterization of the record and directs the court's attention to its Exhibit 8, which turns out to be the same letter of intent.  Similarly, Southaire attaches portions of Edward Brunner's deposition as its Exhibit E. Valley Air also provided additional portions from this same deposition as its Exhibit 18, requiring the court to piece together the deposition to the extent possible to follow the parties' arguments.  The need to cross-reference exhibits is inefficient and contributes to a general air of chaos in the parties' Rule 56 submissions.  The court will provide citations to the parallel documents so the reader can join the court in the unenviable task of cobbling the record together, with several pages of one document in one place, and other pages elsewhere.

[3]  Stephen Cosyns (Valley Air's President) is listed on the docket as a plaintiff and counter-defendant, but he is not included in the caption of the second amended complaint or the "parties" section of the complaint.  The clerk is directed to correct the docket to remove him as a separate party.  *See* Docket No. 204 (stipulation that Stephen Cosyns is not a party).

The court previously denied motions to dismiss filed by the defendants based on the alleged lack of personal jurisdiction. It also found that venue was proper in Illinois and invited both Central Flying and Englert to file proper motions to transfer venue, but they never did so. *See* Docket No. 65 at 6 (December 15, 2006, Memorandum and Order denying Central Flying's motion to transfer venue without prejudice because the issue was raised for the first time in a reply memorandum); Docket No. 133 at 10 (January 3, 2008, Memorandum and Order finding that venue was proper in Illinois and noting that Englert should file a motion to transfer venue if he believed that Arkansas was a more appropriate venue). Thus, although Central Flying attempts to challenge venue in the defendants' joint statement of facts, its challenge is untimely. *See* Defendants' Joint Statement of Facts at ¶ 3.

**B.     The Decision to Purchase the Aircraft**

Stephen and Maureen Cosyns are the husband-wife operators of Valley Air, a small company in Illinois that is in the business of operating charter flights. In 2005, the Cosyns decided to purchase a small jet to improve the flight experience of their current clients and attract new clients. They ultimately became interested in a 1983 Cessna Citation 500, serial no. 550-0478, registration no. N17WC, offered by Southaire.

Southaire and Valley Air signed a letter of intent to purchase the aircraft on August 12, 2005. Central Flying's Exhibit A/Valley Air's Ex. 8 (Letter of Intent to Purchase). The letter stated that it "is a non-binding letter of intent and shall not be construed as an offer, an agreement, or a memorandum of agreement." *Id*. at 3, ¶ 18. Nevertheless, the letter specified that Southaire would pay for the aircraft to undergo Phase I-V Inspections and preparedness inspections per the Cessna Citation manual at Central Flying in Little Rock, Arkansas. *Id*. at ¶ 3.

It also stated that the aircraft would undergo refurbishment of the paint and interior at Central

Flying's location and that Central Flying would review all of the log books. *See id*. at ¶¶ 5, 7.[4]

### C.    Repairs to the Aircraft/Valley Air's Decision to Purchase the Plane

In the summer of 2005, Southaire delivered the plane to Central Flying so Central Flying

could inspect it. *See* Central Flying's Ex. C (Central Flying Proposal). As a result of that

inspection, on August 2, 2005, Central Flying sent Southaire a proposal to perform certain work

on the plane. *Id*. Examples of the kind of repairs in the proposal are replacing a defective strobe

light, correcting the pressure in the anti-skid nitrogen bottle, and fixing a chipped windshield. *Id*.

at C3-C4. The proposal and attached "standard terms and conditions" do not mention Valley Air

and refer to Southaire as the customer. *Id*. Central Flying performed work on the plane pursuant

to work orders between Southaire and Central Flying, although the record does not specify

precisely what work was ultimately performed. *See id*.

Later that month, Ed Brunner (the President of Southaire) and Stephen Cosyns (the

President of Valley Air) signed an Aircraft Sale and Purchase Agreement. *See* Central Flying's

---

[4] Valley Air disputes the defendants' representation that the aircraft would undergo refurbishment of the paint and interior at Central Flying's location and that Central Flying would review all of the log books. In support, it points to portions of the letter of intent that essentially say this, but with different wording. *See* Plaintiffs' Response to Defendants' Joint Statement of Facts at ¶ 5 (disputing the defendants' fact and stating that "Seller agrees that the Aircraft is to remain at Central Flying Service in Little Rock, Arkansas for refurbishment that includes new Paint, Interior and Avionics not to exceed $100,000.00 (One Hundred Thousand). Any costs exceeding the above price shall be the responsibility of Buyer . . . The cost of refurbishment, up to $100,000, shall be paid by Seller . . . . . Seller agrees that as of the Closing all log books shall be complete and reviewed by FAA approved maintenance facility (Central Flying Service, Little Rock Arkansas) at inspection/pre-buy." Central Flying Exhibit B at ¶¶ 5, 7. The basis of this objection is unclear, as a party preparing a Rule 56.1 statement must accurately summarize the evidence but need not quote that evidence. Paragraph 5 easily meets this standard. This example is illustrative, so the court will not summarize the other similarly baseless objections from Valley Air in this order.

Exhibit B/Valley Air's Ex. 9 (Aircraft Sale and Purchase Agreement, signed by Brunner on August 16, 2005, and Cosyns on August 21, 2005). Southaire and Valley Air were the only parties to this contract. *Id*. The contract between Southaire and Valley Air contained a forum selection clause that provided that Illinois law would control. *Id*.

Section 6.2 of the Aircraft Sale and Purchase Agreement is entitled "Pre-Purchase Inspection" and provides in pertinent part that:

> (a)     The Aircraft and the Aircraft documents have already been delivered to Central Flying Services, Little Rock, Arkansas ("the Inspection Facility") for the purpose of enabling the Inspection Facility to conduct (at Seller's expense) an inspection ("Pre-Purchase Inspection") of the Aircraft.

> (b)     The parties acknowledge that the Pre-Purchase Inspection will consist of, at Seller's cost, The Phase I-V inspections, which must be signed off in accordance with the Cessna Citation Model 550 Maintenance Manual. Buyer will perform an acceptance flight after the aircraft has both completed the Phase I-V Inspections and completion of the refurbishment consisting of the new paint and interior. This flight is not to exceed one hour (60 minutes) with Buyer's representative onboard for this flight. All associated costs with the flight are to be borne by the Seller. Seller agrees to allow $25,000 (Twenty-Five Thousand Dollars) to remain in Escrow until the aircraft has completed all the Part 91 required inspections and refurbishment process and the Buyer has successfully made an Acceptance/Test Flight. This money is for rectification of any discrepancies noted on the flight. After which the fill amount or balance of sum shall be returned to SouthAire.

> (c)     If the Pre-Purchase Inspection reveals that the Aircraft is not airworthy (as such term is customarily used and defined in the industry) or otherwise has material FAA Part 91 deficiencies, then unless this Agreement is terminated by Buyer as provided in subparagraph (d) below, the cost of correction of all airworthiness deficiencies and Part 91 deficiencies shall (i) be performed by the Inspection Facility and (ii) paid by the Seller. Seller hereby agrees to correct and to pay for the correction of all airworthy and Part 91 deficiencies. The Parties agree to negotiate reasonably regarding the setting of a timetable for the correction of any airworthiness deficiencies. If, after three business days, the Parties are unable to mutually agree to a timetable for correction of the airworthiness deficiencies in less than 30 days, then the transaction shall be terminated as provided in this Agreement.

(d)     If the Pre-Purchase Inspection reveals that the Aircraft is in a condition not acceptable to Buyer in its sole and absolute discretion, then (i) Buyer may terminate this Agreement by written notice to Seller, (ii) the Deposit shall be refunded to Buyer, (iii) the fees of the Escrow Agent shall be paid equally by the parties, and (iv) thereafter neither party shall have any further obligation to the other hereunder.

(e)     If the Pre-Purchase Inspection reveals that the Aircraft is in a condition that is acceptable to Buyer in its sole and absolute discretion, then Buyer shall execute and deliver to Seller a written certificate (an "Airfare Acceptance Certificate"), whereupon Seller shall make no further use of the Aircraft and the Closing Date shall be scheduled for seven (7) business days following receipt of the Airfare Acceptance Certificate by Seller . . . .

*Id*. at 4, ¶ 6.2(a).

Central Flying originally worked exclusively with Southaire to determine what work to perform on the plane, and entered into a contract with Southaire to perform work.  However, at some point after Valley Air signed the Aircraft Sale and Purchase Agreement, Central Flying became aware that Valley Air would be the plane's ultimate owner.  As such, Central Flying attempted to satisfy both the actual owner of the plane (Southaire) and the future owner of the plane (Valley Air) when performing work on the plane.  *See* Valley Air Ex. 15 (John Shirley Dep.) at 40-43, 67-68.

Central Flying also sent Valley Air proposals to perform additional work on the plane. *See* Valley Air Ex. 14.  The proposals included upgraded finishes inside the plane (*e.g.*, replating all the interior hardware, changing the existing countertop to a solid surface material, and modifying the existing seating to emulate Cessna Bravo seat styling), removing the existing communications system and installing new equipment, installing an XM weather link and flight date display monitors, and removing the left engine starter/generator (with 200 hours remaining) and installing a new unit.  *Id*.  Valley Air was responsible for paying for some of this work.  *See*

-6-

Valley Air Ex. 15 (John Shirley Dep.) at 67-68; Valley Air Ex. 4 (emails between Central Flying and Valley Air).

One of the subcontractors used by Central Flying performed work (correcting a fuel leak) that was not reflected in the relevant work order, which was dated October 12, 2005. Valley Air Ex. 6 (Englert Dep.) at 23, 36.

### D. Inspection and Delivery of Possession of the Plane

#### 1. Pre-Purchase Inspections

Central Flying conducted the Phase I-V Inspection of the plane at Central Flying's facility in Arkansas. See Valley Air's Ex. 20 (Central Flying invoice dated October 12, 2005).

In addition, before Valley Air decided to finalize the purchase of the plane in October of 2005, it asked its then chief pilot, Michael Patrick, to become involved with the plane's preflight inspection. Valley Air Ex. 19/Central Flying's Ex. E (Patrick Dep.) at 7-8.[5] Patrick and Stephen Cosyns thus went to Central Flying's facility in Arkansas and Patrick "look[ed] over the airplane." *Id*. at 8. When doing so, he "followed the checklist, preflighted the airplane." *Id*. at 9. He found an inoperative landing light and low brake fluid but did not find any other discrepancies. *Id*.

Cosyns also testified that he inspected the plane when he arrived in Arkansas. According to Cosyns, in addition to the issues identified by Patrick, he found "many other discrepancies that I just don't recall." Valley Air Ex. 11 (S. Cosyns Dep.) at 73. He told Englert about these

---

[5] The court reminds Central Flying's counsel to ensure that they always include the first page of a deposition excerpt so the identity of the deponent is clear. *See, e.g.*, Central Flying's Ex. E.

deficiencies, and was not aware that any of the deficiencies still existed as of a few days later on October 11, 2005, when he flew the plane from Arkansas to Illinois.  *Id*. at 73-74.

Patrick testified that the plane was serviced to his satisfaction prior to departure.  Valley Air Ex. 19/Central Flying's Ex. E (Patrick Dep.) at 7-8.  As chief pilot, Patrick was not responsible for writing up discrepancies.  *Id*. at 12.  However, Patrick would not have flown the plane if there were any discrepancies.  *Id*. at 14.  Similarly, Stephen Cosyns testified that a preflight inspection is necessary and that "[a]n airplane cannot fly" if there are any discrepancies. Valley Air Ex. 11 (S. Cosyns Dep.) at 74.

## 2.  Delivery

On October 11, 2005, Southaire delivered possession of the aircraft to Valley Air and Stephen Cosyns, on behalf of Valley Air, signed an "Aircraft Delivery Receipt" and "Aircraft Acceptance Receipt."  Southaire Exhibit A (Aircraft Delivery Receipt); Southaire Exhibit B (Aircraft Acceptance Certificate).  The Aircraft Delivery Receipt stated that "Buyer hereby accepts delivery of the Aircraft" and specified that "[t]he aircraft is accepted on the terms and subject to the Aircraft Purchase Agreement."  Southaire Exhibit A.  In turn, the Aircraft Delivery Receipt stated:

> Pursuant to the Aircraft Sale and Purchase Agreement ("Agreement") effective the 11th day of October, 2005, by and between:
>
> Ed Brunner, Southaire, Inc. ("Seller")
> and
> Stephen M. Cosyns, Valley Air Service, Inc. ("Buyer")
>
> Buyer has conducted a Pre-Purchase Inspection of the following aircraft:
>
> Aircraft Make and Model: 1983 CESSNA CITATION 550

Manufacturer Serial Number: 550-0478

Registration Number: N17WC

together with the engines installed thereon, and together with any and all existing avionics, equipment and accessories (loose or installed), as listed in Exhibit A of the Purchase Agreement (collectively, the "Aircraft").

Based on the results of the Pre-Purchase Inspection, Buyer has determined that:

_____    The condition of the Aircraft is <u>not</u> satisfactory to Buyer.  The Agreement shall be terminated, and any amounts paid by Buyer shall be immediately refunded as provided in the Agreement.

_____    The condition of the Aircraft is satisfactory to Buyer.

<u> X </u>    The condition of the Aircraft is satisfactory to Buyer subject to Seller's timely correction of the deficiencies listed in the attachment hereto.  Note that sidepanel materials, countertop, laminate and seat leather was not what was ordered and installed by Central Flying Service.

Southaire Ex. B.

Following delivery of the plane, Valley Air flew it from Arkansas to Illinois.

**E.    Condition of the Plane**

**1.    Aircraft Sale and Purchase Agreement  –Seller Representations and Warranties**

The Aircraft Sale and Purchase Agreement contained a section entitled "Seller Representations and Warranties."  Valley Air Ex. 9 at § 5 (Aircraft Sale and Purchase Agreement).  This section specified that Southaire would convey good title and that the plane had a valid FAA Certificate of Airworthiness "and is in airworthy condition with all systems in normal operating condition, per the manufacturer's maintenance and operating manuals and specifications."  *Id*. at § 5(a) & (b).  Other relevant provisions included:

§ 5(c) (in which Southaire warranted that the documents and log books were complete and accurate for the time that Southaire owned the plane, and that for the period before it owned the plane, those materials were accurate and complete to the best of its knowledge);

 § 5(d) (the plane had all required inspections prior to the closing date and all airworthiness directives and mandatory service bulletins have been complied with),

§ 5(e) ("The Aircraft does not now have, nor has it had in the past, any structural or corrosion damage except as noted in the logbooks");

§ 5(h) . . . (The Aircraft has not incurred damage during Seller's period of ownership, or the ownership of the prior owner of said aircraft, said owner being a customer of seller, and no damage history is reflected in the Aircraft's records from the time of the first delivery by the manufacturer, except as specifically noted in Exhibit "B");[6] and

§ 5(j) ("said aircraft is in compliance with all FAA Part 91 regulations and specifications").

## 2.  Post-Purchase Flights/Inspections

Patrick traveled back to Illinois in the plane after it was purchased on October 11, 2005.

*See* Valley Air. Ex. 19/Southaire Ex. C (Patrick Dep.) at 11.  During that flight, he was still

Valley Air's Chief Pilot and served as second-in-command, while Cosyns was the pilot-in-

command.  As noted above, Patrick preflighted the plane and found low brake fluid, which was

replenished prior to departure, as well as an inoperative landing light.  In addition, Patrick

---

[6]  Exhibit B is the Aircraft Acceptance Certificate which is also attached as Southaire Exhibit B.  The Aircraft Delivery Receipt that was executed stated that "Buyer hereby accepts delivery of the Aircraft" and specified that "[t]he aircraft is accepted on the terms and subject to the Aircraft Purchase Agreement."  It did not, however, list any damage history.

testified that during the flight, Cosyns told him that he believed that the trim was almost to its limit.[7]

Bruce Rebechini, "who performed some maintenance on the Aircraft after Valley Air took possession," Valley Air's Additional Facts at ¶ 25, opined that it can take several hours of flight before a deficiency becomes apparent, but could not point to any manual, study, or document supporting this opinion.[8] Valley Air Ex. 13 (Rebechini Dep.) at 112. He also opined that a one-hour test flight should be sufficient for a Cessna Citation, but might not be long enough for some people. He based this opinion on his experience in the aviation industry but noted that no manual, study, or document supporting this opinion existed. *Id*. at 111-12. FAA inspector James Kennedy, Valley Air's Additional Facts at ¶ 25, testified that it is possible for some conditions to manifest themselves on an intermittent as opposed to a continuous basis so that it would take more than one hour of flight to detect them. Valley Air Ex. 23/Southaire Ex. D (Kennedy Dep.) at 87-88.[9]

---

[7] The parties do not provide any specifics, but a trim system appears to be designed to alleviate control forces required to maintain a steady flight. *See generally* http://www.grc.nasa. gov/WWW/K-12/airplane/trim.html (last visited Apr. 16, 2009).

[8] The deposition excerpt for Bruce Rebechini provided by Valley Air begins at page 42, so the court knows only that Rebechini – who appears to be some sort of airplane professional – worked at some point on the plane.

[9] As with Rebechini, Valley Air provides deposition excerpts for Kennedy that omit the beginning of the deposition, when presumably counsel asked Kennedy about his current and past jobs. The parties' practice of submitting different portions of the same documents, however, has finally turned out to be helpful, as Southaire attached portions of Kennedy's deposition that indicate that in 2005, Kennedy was the FAA Principal Maintenance Inspector for Valley Air. Southaire Ex. D at 9.

Patrick was Cosyns's second-in-command for round trip flights between DuPage County Airport and Salt Lake City, Utah, on October 19, 2005, and October 28, 2005. Southaire Exhibit C/Valley Air Ex. 19 (Patrick Dep.) at 13-16. Patrick preflighted the plane for these flights and did not find any discrepancies. *Id.* at 13. He did not recall if Cosyns found any discrepancies prior to these flights, but stated that he would not have flown if he had been aware of any discrepancies. *Id.* at 14.

Patrick also testified that Cosyns told him he thought that the plane was leaking fuel, had improperly sealed windows resulting in a loss of cabin pressurization, and had a "precession problem with the gyro" but could not provide any specifics as to when these conversations occurred. *Id.* at 21-24. In addition, Patrick described a flight to Orlando on a date he could not recall where the plane had to make an emergency landing because of a problem that was determined to be the squat switch. *Id.* at 22. In all the times that Patrick was on the aircraft, he never was concerned about the safety of the flight, the safety of any passengers, or the plane's airworthiness. *Id.* at 26.

In October of 2005, after Valley Air took possession of the plane, Kennedy reviewed the plane's documents, conducted a "conformity check," and "physically inspected" the plane while it was on the ground in connection with FAA paperwork. Valley Air Ex. 23/Southaire Ex. D (Kennedy Dep.) at 14. The physical inspection necessary for the paperwork is not in-depth. *Id.* at 15. Kennedy testified that when he completed the FAA paperwork, he believed that the plane was "airworthy," "generally free from defect," and "suitable for safe flight." *Id.* at 32-34, 39. He then reviewed the list of discrepancies in Valley Air's complaint and clarified that he did not have personal knowledge as to whether certain of these alleged discrepancies existed, since he

had not seen the plane in operation.  *Id*. at 66-68.  He also testified that if any of the discrepancies alleged by Valley Air existed and he had been aware of them, the plane would not be airworthy and would not have been allowed to fly.  *Id*. at 35.

### 3. Past Damage to the Plane

At his deposition, Brunner (Southaire's President) testified that he was not aware of any damage history to the aircraft. Valley Air Ex. 18/Southaire Ex. E (Brunner Dep.) at 67-68. Valley Air, however, notes that a quote dated August 18, 2005, on a Southaire form, states that "Fuselage and tops of wings all have major dents with filler.  Sand, fill and fair all affected areas."  Valley Air Ex. 24/Brunner Dep. Ex. 18, (August 18, 2005 Quote).  When asked about this document, Brunner stated that, "yes, he was then aware of the dents" and that he became aware of  the presence of major dents with filler on the fuselage and tops of the wings when Central Flying told him about the plane's condition in August of 2005.  Valley Air Ex. 18/Southaire Ex. (Brunner Dep.) at 79-80.

The record also contains a discrepancy list from Central Flying dated July 20, 2005, indicating that Central Flying advised Southaire that the co-pilot's side window was chipped (item 5021) and that there was corrosion under both rudder static wick bases (item 5025).  Valley Air Ex. 17/Brunner Dep. Ex. 17 (Discrepancy List dated August 3, 2005) at 4.  In this list, Central Flying listed prices for various work that it deemed necessary on the plane, and that Brunner was "sure" were brought to his attention.  Valley Air Ex. 18/Southaire Ex. (Brunner Dep.) at 74.  Southaire authorized Central Flying to perform avionics and maintenance work after reviewing the August 3, 2005, discrepancy list.  *Id*. at 75.

### 4. Valley Air's Position Regarding the Plane's Condition

Cosyns prepared an undated list of discrepancies (*i.e.*, problems with the plane) that were discovered after Valley Air took possession of the plane. Valley Air Ex. 10 (Discrepancy List). The problems included a fuel leak, improperly sealed windows, improper balance controls, a malfunctioning throttle, and inaccurate records. *Id.* He testified that the discrepancies should all have been discovered and corrected during a Phase I-V inspection. Valley Air Ex. 11 (S. Cosyns Dep.) at 116. Rebechini also testified that he believed that the Phase I-V inspection and necessary follow-up work had not been performed properly. According to Rebechini, if Central Flying had done so, the discrepancies discovered by Valley Air would not have existed. Valley Air Ex. 13 (Rebechini Dep.) at 52-55. As noted above, the discrepancy list also included the existence of undisclosed damage to the plane.

## II. Discussion

In its seven-count complaint, Valley Air asserts the following claims: breach of contract against Southaire (Count I), common law fraud against Southaire and Brunner (Count II), Illinois Consumer Fraud Act against Southaire and Brunner (Count III), breach of contract under a third party beneficiary theory against Central Flying (Count IV), negligent misrepresentation against Central Flying and Englert (Count V), common law fraud against Central Flying and Englert (Count VI), and Illinois Consumer Fraud Act against Central Flying and Englert (Count VII). Southaire and Brunner have moved for summary judgment as to Counts I, II, and III, and Central Flying and Englert have moved for summary judgment as to Counts IV, V, and VII, but not Count VI.

The contract between Southaire and Valley Air contained a forum selection clause that provides that Illinois law controls. The parties agree that Illinois law applies to all counts except Count V, which is directed at Central Flying and Englert, so the court will only conduct a choice of law analysis for this count and will otherwise look to Illinois law.

### A.      Standard for A Motion For Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party opposing the summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading"; rather, it must respond with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992). A court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Id*.

### B.      Breach of Contract Against Southaire (Count I)

Valley Air contends that Southaire breached the Aircraft Sale and Purchase Agreement by delivering a defective plane riddled with latent defects. Southaire, on the other hand, asserts that the record does not show that it breached the contract. In support, Southaire notes that Michael Patrick piloted the plane several times immediately following Valley Air's purchase and testified that he did not observe any of the claimed defects. It also stresses that James Kennedy, a Federal Aviation Administration official, inspected the plane and did not observe any of the claimed

-15-

defects.  In addition, Southaire asserts that to the extent that Valley Air is trying to state a claim for a breach of the implied warranty of merchantability, it cannot prevail as the plane was airworthy.

In essence, Southaire's position is that it performed its obligations under the contract, Valley Air took a test flight as specified in the contract, Valley Air then gave Southaire a list of discrepancies, Southaire fixed them, and that is the end of the matter.  According to Southaire, if there are indeed any other issues with the plane (which it denies), they are not its responsibility because it did everything it was required to do under the contract.

To prevail on a breach of contract claim under Illinois law against Southaire, Valley Air must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract by Valley Air; (3) a breach by Southaire; and (4) resultant damages.  *TAS Distributing Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007).  Element three – breach by Southaire – is the critical one for purposes of Southaire's motion for summary judgment on Valley Air's breach of contract claim.

As noted by Southaire, Patrick flew on the plane and testified that he never was concerned about the safety of the flight, the safety of any passengers, or the plane's airworthiness.  Kennedy similarly signed FAA paperwork allowing the plane to fly, and testified that he would not have done so had he known about the issues identified by Valley Air.  Valley Air, on the other hand, disputes that the plane was airworthy and contends that Southaire delivered a plane that did not, among other things, have a proper Phase I-V inspection.

The court need not delve into the evidence about the plane's condition because Valley Air's breach of contract claim is not based solely on the portions of the contract regarding

airworthiness. As noted by Valley Air, the contract also contained warranties by Southaire that the plane's records were complete and accurate for the time that Southaire owned the plane, and that for the period before it owned the plane, those materials were accurate and complete to the best of its knowledge. *See* Valley Air Ex. 9 at § 5(c) (Aircraft Sale and Purchase Agreement). Valley Air has pointed to evidence (which is deemed admitted for purposes of summary judgment since the defendants did not respond to Valley Air's statement of additional facts) indicating that the records were incomplete.

In addition, Brunner admitted that he knew that the plane had "major dents" on the fuselage and tops of the wings that had been filled. There is no explanation as to what, other than prior damage, could have caused these dents, and it is undisputed that Southaire did not disclose what appears to be structural damage to Valley Air before Valley Air took delivery of the plane. The contract, however, contains Southaire's warranty that "[t]he Aircraft does not now have, nor has it had in the past, any structural or corrosion damage except as noted in the logbooks" and "has not incurred damage during Seller's period of ownership, or the ownership of the prior owner of said aircraft, said owner being a customer of seller, and no damage history is reflected in the Aircraft's records from the time of the first delivery by the manufacturer . . . " *Id*. at § 5(e) & (h).

Thus, material issues of disputed fact exist as to whether Southaire breached its contract with Valley Air. Accordingly, the court must deny Southaire's motion for summary judgment as to its breach of contract claim (Count I).

## C.    Common Law Fraud Against Southaire and Brunner (Count II)[10]

Valley Air argues that Brunner and other Southaire employees made fraudulent statements about the plane's condition – including the claim that the plane had no damage history – to induce Valley Air to purchase the plane.  In response, Southaire and Brunner essentially repeat their arguments regarding breach of contract and contend that the plane was airworthy.  They also assert that no evidence shows that Brunner or anyone at Southaire knew about the alleged problems with the plane.

To prevail on its fraud claim under Illinois law, Valley Air must establish that: (1) Southaire/Brunner made a false statement of material fact; (2) Southaire/Brunner knew the statement was false or made the statement in reckless disregard of the truth; (3) the statement was made with the intent to induce action; (4) Valley Air reasonably believed the statement and justifiably acted in reliance on it; and (5) Valley Air suffered damages as a result.  *See Kapelanski v. Johnson*, 390 F.3d 525, 530-31 (7th Cir. 2004), *citing Soules v. Gen. Motors Corp.*, 79 Ill.2d 282, 286 (Ill. 1980).

The court's analysis begins and ends with Brunner's testimony about the existence of prior undisclosed damage to the plane.  Southaire and Brunner stress, in their motion for summary judgment, that Brunner testified that he was not aware of any damage history to the aircraft.  It is true that Brunner made this statement at his deposition.  However, when asked about a work order to repair the "major dents," Brunner admitted that, "yes, he was then aware of the dents" and that he became aware of  the presence of major dents with filler on the fuselage

---

[10]  In Count VI, Valley Air asserts a similar claim of common law fraud against Central Flying and Englert.  Central Flying and Englert, however, did not move for summary judgment as to this count.

and tops of the wings when Central Flying told him about the plane's condition in August of 2005.

Southaire and Brunner do not attempt to explain why the presence of "major dents" is not a material representation. Instead, they flatly assert – contrary to the record – that Brunner did not know about the dents. This is not supported by the record. Hence, Southaire and Brunner's motion for summary judgment as to Valley Air's fraud claim (Count II) is denied.

### D.    Illinois Consumer Fraud Act Against Southaire and Brunner (Count III) & Central Flying and Englert (Count VII)

Southaire/Brunner and Central Flying/Englert seek summary judgment as to the Illinois Consumer Fraud Act claims directed at them. Southaire and Brunner contend that Valley Air's Consumer Fraud Act claim is, in fact, a claim for breach of contract, which is not actionable under the Consumer Fraud Act. In turn, Central Flying and Englert assert that the Illinois Consumer Fraud Act has no extraterritorial effect and thus does not apply to conduct occurring outside Illinois and that, in any event, Valley Air is not a consumer under the Act.

### 1.    Southaire/Brunner

The Illinois Supreme Court has held that "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mutual Auto Ins. Co.*, 216 Ill.2d 100, 169 (Ill. 2005). Valley Air contends that this rule is inapposite because its Illinois Consumer Fraud Act claim is based on statements made by Southaire/Brunner to induce it to enter into the contract. Valley Air then notes that false statements made to induce a plaintiff to sign a contract (as opposed to a breach of contract claim) can form the basis for a Consumer Fraud Act claim. *See Pappas v. Pella Corp.*, 363 Ill.App.3d 795, 799 (1st Dist. 2006) (Consumer

Fraud Act claim based on misrepresentations about windows could proceed because there was "no evidence that plaintiffs' claims are based on a simple breach of warranty or breach of contract" given that the "plaintiffs do not allege that [the defendant] breached any promises to them"). Thus, in essence, Valley Air contends that Southaire/Brunner fraudulently induced it to sign the contract so it can pursue an Illinois Consumer Fraud Act claim despite the Illinois Supreme Court's decision in *Avery*.

Relying on *Avery*, the Seventh Circuit has held that a plaintiff cannot seek relief under the Consumer Fraud Act if it "seeks to enforce an unfulfilled contractual promise." *Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 902 (7th Cir. 2006); *see also Wooley v. Jackson Hewitt, Inc.*, 540 F.Supp.2d 964 (N.D. Ill. 2008); *Langendorf v. Conseco Senior Health Insurance Company*, 590 F.Supp. 1020, 1023-24 (N.D. Ill. 2008). For example, in *Shaw v. Hyatt Int'l Corp.*, the plaintiff filed suit based on a misrepresentation on Hyatt's website regarding the room rate. The Seventh Circuit acknowledged that the advertised rate was "designed to lure potential guests into making a reservation." 461 F.3d at 902. Nevertheless, it rejected the plaintiff's Consumer Fraud Act claim because the plaintiff "[sought] to enforce an unfulfilled contractual promise." *Shaw v. Hyatt Int'l Corp.*, 461 F.3d at 902.

In the instant case, the contract contains specific language stating that the plane had no past damage. *See* Valley Air Ex. 9 at § 5(e) & (h) (Aircraft Sale and Purchase Agreement). Moreover, Valley Air has pointed to evidence supporting its claim that Southaire and Brunner breached the contract by, among other things, selling it a plane with undisclosed past damage. The court thus rejects Valley Air's attempt to proceed simultaneously on a breach of contract claim and a Consumer Fraud Act claim.

This conclusion is not altered by Valley Air's citation to *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*, Nos. 05 C 2623, 05 C 4742 & MDL-1703, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006). In that case, the plaintiffs alleged that the defendant deceptively advertised its proprietary line of Craftsman tools as manufactured exclusively in the United States when many of the tools were made outside the United States or contained a significant number of foreign parts. *Id*. at *1. The court held that the advertising was an actionable misrepresentation, even though it was made to induce consumers to purchase Craftsman tools because the "Plaintiffs complain that Sears induced them to buy Craftsman tools by misrepresenting the country of origin of the tools, not simply that Sears made a false promise of future conduct." *Id*. at *3 n.8.

It is important to note, however, that the misrepresentation about the origin of the tools at issue in *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation* was not directly addressed by a contract. In contrast, the contract between Southaire and Valley Air contains specific representations about the condition of the plane. Accordingly, Valley Air's Consumer Fraud Act claim is barred because it is a claim for breach of contract. Southaire and Brunner are, therefore, entitled to summary judgment as to Count III.

### 2. Central Flying/Englert

As stressed by Central Air and Englert, Valley Air contracted with Southaire to purchase the plane, and Central Air was not a party to this contract. Thus, Valley Air's Consumer Fraud Act claim against Central Flying and Englert is not affected by the Southaire–Valley Air contract. This does not spell victory for Valley Air, however, because Central Flying and Englert assert

that the Illinois Consumer Fraud Act is inapplicable because the alleged fraud occurred primarily in Arizona and that, in any event, Valley Air is not a consumer under the Act.

Valley Air contends that because it is an Illinois citizen, the Consumer Fraud Act necessarily is available regardless of where the wrongful activity occurred. Central Flying and Englert take a diametrically opposed position and point to the Illinois Supreme Court's statement in *Avery* that "the General Assembly did not intend the Consumer Fraud Act to apply to fraudulent transactions which take place outside Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d at 185. According to Central Flying/Englert, this means that the Consumer Fraud Act applies only to conduct that occurred 100% in Illinois.

The positions of both sides are at odds with the Illinois Supreme Court's decision in *Avery*. With respect to Valley Air, the Illinois Supreme Court surveyed cases interpreting the Consumer Fraud Act in a variety of ways and noted that some courts have concluded that the scope of the Act is limited "based on the residency of the plaintiff." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d at 182. The court then went on to adopt an entirely different test: whether "the circumstances relating to the transaction occur primarily and substantially within [Illinois]." *Id*. at 187. With respect to Southaire and Englert, the quoted sentence is out-of-context and does not fairly reflect the holding of the *Avery* decision.

The court thus turns to what the Illinois Supreme Court did actually hold in *Avery*. In determining if "the circumstances relating to the transaction occur[red] primarily and substantially within [Illinois]," this court must consider where the bulk of the circumstances making up the allegedly fraudulent transaction occurred. *Id*. at 185-86. There is no bright line test. *Id*. at 187. Instead, the court must conduct a case-by-case inquiry and focus on the place of

injury or deception, the location of the parties, the location where relevant activities occurred, and the parties' contacts with Illinois. *Id*. at 188.

Here, Valley Air notes that if there are indeed latent problems with the plane, it is likely that Illinois residents will be affected since Valley Air operates flights out of Illinois. It also points out that it is an Illinois citizen, it felt injury in Illinois, and the plane is hangared in Illinois. Response at 19. Possible future harm to persons traveling on the plane caused by operation of the plane and the current location of the plane are not relevant to whether the circumstances relating to the alleged fraud "occur[red] primarily and substantially within [Illinois]." *Id*. at 185-86. This leaves the fact that Valley Air is an Illinois citizen and felt injury in Illinois. In addition, Valley Air communicated with Central Flying from Illinois.

On the other side of the balance, Central Flying is located in Arkansas, all of the work on the plane occurred in Arkansas, Valley Air conducted its test flight and accepted the plane in Arkansas, the Phase I-V inspections occurred in Arkansas, Central Flying reviewed all of the log books in Arkansas, and Valley Air took possession of the plane in Arkansas. The Phase I-V inspections and subsequent work on the plane are at the heart of Valley Air's fraud claim and constitute the overwhelming bulk of the circumstances relating to the alleged fraud. The fact that Valley Air took the test flight in Arkansas is also very meaningful. Valley Air performed the test flight to determine if it wanted to consummate the purchase, so what occurred during the flight and representations made about the plane before and after the flight, are critical.

Thus, the fraud has some connection to Illinois. However, the court simply cannot conclude that the circumstances relating to the alleged fraud "occur[red] primarily and substantially within [Illinois]." *Id*. at 185-86. Accordingly, Valley Air's Consumer Fraud Act

claim against Central Flying and Englert fails as a matter of law and Central Flying and Englert are entitled to summary judgment as to Count VII. In light of this conclusion, the court will not address Central Flying and Englert's arguments about Valley Air's status as a consumer under the Consumer Fraud Act.

### E. Breach of Contract under a Third Party Beneficiary Theory Against Central Flying (Count IV)

Central Flying stresses that it contracted with Southaire, not Valley Air, so Valley Air is at best an incidental third party beneficiary of the Central Flying–Southaire contract and cannot proceed with a breach of contract claim against Central Flying. Valley Air, on the other hand, argues that it may sue Central Flying because Central Flying "knew from the very beginning that Valley Air was the ultimate user of the Aircraft" and thus knew that the Central Flying-Southaire contract was for the benefit of Valley Air. Valley Air Response at 13.

Only an intended beneficiary (as opposed to an incidental beneficiary) may assert rights pursuant to a contract under a third-party beneficiary theory. *See, e.g., B.C. v. J.C. Penney Co.*, 205 Ill.App.3d 5, 9-10 (1st Dist. 1990). The key question before the court is, therefore, whether Valley Air was an intended or incidental beneficiary to the Southaire–Central Flying contract.

"[T]here is no question that the seminal and still vital Illinois authority as to third party beneficiaries is *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252 (1931)." *F.W. Hempel & Co., Inc. v. Metal World, Inc.*, 721 F.2d 610, 613 (7th Cir. 1983). In *Carson Pirie Scott*, the Illinois Supreme Court held that:

> The rule is, that the right of a third party benefited by a contract to sue thereon rests upon the liability of the promisor, and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed. The liability so appearing can not be extended or enlarged on the ground, alone, that

the situation and circumstances of the parties justify or demand further or other liability.

346 Ill. at 258.

Thus, when determining whether the contracting parties intended to benefit a third party directly, the court must consider the contract's express terms and the circumstances at the time the contract was executed. *F.W. Hempel & Co., Inc. v. Metal World, Inc.*, 721 F.2d at 613, *citing Carson Pirie Scott & Co. v. Parrett*, 346 Ill. at 258; *Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d 908, 913 (7th Cir. 1989) (post-contract negotiations with a third party that stood to benefit from the contract were "virtually irrelevant to the parties' intent at the time the contract was executed" because only the circumstances at the time the contract is executed are pertinent).

In addition, a party is not automatically precluded from filing suit as a third party beneficiary if its name is not in the underlying contract, as "[a] contract may define a third party by description of a class, and it is sufficient if the plaintiff may be identified at the time performance is due as a member of the class intended to be benefitted." *Altevogt v. Brinkoetter*, 85 Ill.2d 44, 54-55 (1981). However, there is a strong presumption that parties intend contract provisions to apply only to themselves. *155 Harbor Drive Condominium Assoc. v. Harbor Point Inc.*, 209 Ill.App.3d 631, 645-46 (1st Dist. 1991). To overcome this presumption, there must "practically be an express declaration." *Id.*; *see also Quinn v. McGraw-Hill Cos.*, 168 F.3d 331, 334 (7th Cir. 1999) ("Express language in the contract identifying the third-party beneficiary is the best evidence of intent to benefit that party. . . , but the courts have also accepted an implied showing where the implication that the contract applies to third parties is so strong as to be

practically an express declaration") (internal citations and quotations omitted); *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.*, 78 Ill.2d 381, 386-87 (Ill. 1980) (the party seeking to assert third-party beneficiary status "[was] a proper party plaintiff because it is a direct beneficiary clearly identified and intended in the contract before us").

As noted above, Valley Air seeks to proceed as a third party beneficiary based on its allegation that Central Flying knew that Southaire did not intend to keep the plane itself and, instead, was overhauling it in the hopes of eventually selling it to Valley Air. There are three problems with this argument. First, the contract is between Southaire and Central Flying, and Valley Air has not pointed to any language in the contract suggesting that Southaire and Central Flying intended to make Valley Air a direct beneficiary who can sue Central Flying directly. *See Altevogt v. Brinkoetter*, 85 Ill.2d at 54-55; *see also Sharif v. International Development Group Co., Ltd.*, 399 F.3d 857, 861 (7th Cir. 2005) (looking to the parties' contract to determine if it manifests an intention to confer a benefit upon the third party).

Second, it is important to distinguish between direct and incidental beneficiaries. "Illinois recognizes two types of third-party beneficiaries, intended and incidental. An intended beneficiary is intended by the parties to the contract to receive a benefit for the performance of the agreement and has rights and may sue under the contract; an incidental beneficiary has no rights and may not sue to enforce them." *Estate of Willis v. Kiferbaum Const. Corp.*, 357 Ill.App.3d 1002, 1107-08 (1st Dist 2005). The mere fact that Company X receives a benefit as a result of a contract between Company Y and Company Z does not automatically make Company X a direct beneficiary who can sue on the Company Y–Company Z contract. Valley Air's argument that its receipt of a benefit from the Southaire–Central Flying contract means it can

proceed directly against Central Flying even though it contracted only with Southaire is thus not persuasive.

In this regard, the Seventh Circuit's decision in *Quinn v. McGraw-Hill Companies, Inc.*, 168 F.3d 331 (7th Cir. 1999) is helpful. In *Quinn*, the plaintiff contended that he was the third party beneficiary of a contract between Standard and Poor and an issuer of bonds whereby Standard and Poor would rate bonds. The plaintiff asserted that "the parties must have known that investors like him were the beneficiaries of the rating contract" because "[t]his is just the way bond markets work . . . ." *Id*. at 334. Alternatively, he argued that he was an intended beneficiary of the obligation Standard & Poor had to monitor bonds.

The Seventh Circuit rejected these arguments, explaining:

> We do not doubt that investors derive valuable information from an S & P bond rating, both at the time of purchase and during the time they hold the bonds. The pertinent question, however, is whether the actual . . . contract contains either express language identifying purchasers like Quinn by name or its functional equivalent. Here, Quinn practically concedes in this court that he cannot meet Illinois's high standard. He has not referred us to any text at all in the contract that would indicate, either explicitly or implicitly, the necessary intent to benefit. Instead, his argument is almost a structural one, relying on the way he thinks bond markets work. In our view, an Illinois court would find this insufficient as a matter of law to state a claim for breach as to a third-party beneficiary.

*Id*. at 334-35.

Here, as in the *Quinn* case, Valley Air's argument rests on its assertion about how the airplane rebuilding market works. The actual Southaire–Central Flying contract does not support his argument as it does not show that the contracting parties intended Valley Air (or the ultimate purchaser of the plane) to be an intended beneficiary.

Third, Valley Air stresses that after Central Flying inspected the plane and started to effect repairs and improvements, Central Flying found out that Valley Air was the potential owner of the plane and sought input from Valley Air regarding the work. According to Valley Air, this means that Central Flying intended for Valley Air to benefit from the work and agreed that Valley Air could sue Central Flying if that work was subpar. The problem with this argument is that the court must focus on the time when a contract is executed, not when it is performed. *F.W. Hempel & Co., Inc. v. Metal World, Inc.*, 721 F.2d at 614 (subsequent communications between promisor and third party are irrelevant to third-party beneficiary analysis); *Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d at 913 (the fact that the plaintiff engaged in negotiations with Longview, resulting in contract modifications regarding the product's delivery date, was irrelevant because this occurred after the underlying contract between the promisor and promisee was executed). Thus, events transpiring after the Southaire–Central Flying contract was executed cannot support Valley Air's contention that it was an intended third-party beneficiary.

The court thus concludes that the record shows, as a matter of law, that Valley Air was at most an incidental beneficiary of the Southaire–Central Flying contract. This means that Central Flying is entitled to summary judgment as to Count IV.

### F.     Negligent Misrepresentation Against Central Flying and Englert (Count V)

Central Flying and Englert suggest that Arkansas law governs Valley Air's negligent misrepresentation claim against them, which is unsurprising as Arkansas law does not recognize a cause of action for negligent misrepresentation. On the other hand, Valley Air contends that

the tort of negligent misrepresentation under Illinois law is identical to the tort of constructive fraud under Arkansas law so Central Flying and Englert's argument is much ado about nothing.

### 1.     Is a Choice of Law Analysis Necessary?

Before engaging in a choice of law analysis, the court must determine that there is a genuine conflict.  *See Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994).  The Arkansas Supreme Court has expressly declined to recognize the tort of negligent misrepresentation.  *South County, Inc. v. First Western Loan Co.*, 315 Ark. 722, 725 (Ark. 1994).  On the other hand, the Illinois Supreme Court "has recognized a duty to communicate accurate information" when: (1) the allegedly inaccurate information results in physical injury to a person or harm to property"; or (2) the defendant "is in the business of supplying information for the guidance of others in their business transactions."  *Brogan v. Mitchell Int'l*, 181 Ill.2d 178, 183-84 (1998).

Valley Air concedes that any claim for negligent misrepresentation under Arkansas law would be doomed as it attempts to recast this claim as a request for relief based on a different tort (the Arkansas tort of constructive fraud).  *See South County, Inc. v. First Western Loan Co.*, 315 Ark. at 725 (distinguishing between the torts of constructive fraud and negligent misrepresentation).  Despite the fact that Valley Air's Arkansas constructive fraud claim appears for the first time in Valley Air's response to Central Flying/Englert's motion for summary judgment, the court will consider it as Central Flying/Englert address this claim on the merits.

Under Arkansas law, constructive fraud is "based upon a breach of a legal or equitable duty which the law declares to be fraudulent because of its tendency to deceive others, regardless of the moral guilt, purpose or intent of the fraudfeasor."  *South County, Inc. v. First Western Loan Co.*, 315 Ark. at 726-27, *quoting Miskimins v. City Nat'l Bank*, 248 Ark. 1194, 1204 (Ark.

1970). This tort is not the same as the Illinois tort of negligent misrepresentation. Accordingly, the court will conduct a choice of law analysis for Count V.

## 2. Choice of Law Analysis – Illinois or Arkansas?

In a diversity case, a federal court must follow the conflict of laws principle of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941). The Illinois Supreme Court uses the Restatement (Second) of Conflicts of Law's "most significant relationship" test to resolve choice of law disputes. *See, e.g., Esser v. McIntyre*, 169 Ill.2d 292, 297-98, 661 N.E.2d 1138, 1141 (Ill. 1996). When determining what state has the most significant relationship to a plaintiff's negligent misrepresentation claim, relevant factors include: (1) the place where Valley Air acted in reliance on the defendant's representations; (2) the place where Valley Air received the representations; (3) the place where the defendant made the representations; (4) the domicile, residence, nationality, place of incorporation and place of business of the parties; (5) the place where a tangible thing which is the subject of the transaction (here, the airplane) was situated; and (6) the place where Valley Air was to render performance under a contract which it was induced to enter by the defendant's false representations. *See* Restatement (Second) of Conflict of Laws § 148 (1971) (fraud and misrepresentation); *see also Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill.2d 45, 61-62 (Ill. 2007).

Central Flying and Englert note that the plane was in Arkansas while Central Flying was working on it, Valley Air inspected the plane in Arkansas, the sale of the plane was closed in Arkansas, and Valley Air took possession of the plane in Arkansas. Valley Air does not comment on the choice of law factors and thus has waived any arguments relating to these factors. However, Valley Air is an Illinois corporation and the Cosyns appear to have

communicated with Central Flying from their home base in Illinois. Given the weight of
Arkansas' connections with the alleged misrepresentations about the plane's condition, the court
declines to find that Illinois law applies simply because Valley Air is located in Illinois. The
court will, therefore, apply Arkansas law to Count V.

### 3.    Constructive Fraud Under Arkansas Law

As noted above, under Arkansas law, "[c]onstructive fraud is a type of fraud based on a
breach of a legal or equitable duty which the law declares to be fraudulent because of its
tendency to deceive others, regardless of the moral guilt, purpose, or intent of the perpetrator."
*Evans Indus. Coatings, Inc. v. Chancery Court of Union County, Third Div.*, 315 Ark. 728, 733
(Ark. 1994). Central Flying/Englert contend that any claim for constructive fraud under
Arkansas law fails as a matter of law because Central Flying contracted with Southaire, so Valley
Air was not in privity with Central Flying. Based on the lack of privity, Central Flying and
Englert conclude that they had no duty to Valley Air, and thus cannot be liable for constructive
fraud. Valley Air, however, contends that Central Flying and Englert had a duty to provide
accurate information about the plane's condition and reveal that a proper Phase I-V inspection
had not been performed.

Constructive fraud can exist when the parties have a confidential or special relationship
which creates "a duty to speak and clarify information upon which others might rely." *Archer
Daniels Midland Co. v. Beadles Enterprises, Inc.*, 367 Ark. 1, 83-84 (Ark. 2006). "The question
as to what duty is owed is always a question of law." *Allen v. Allison*, 356 Ark. 403, 415 (Ark.
2004). Valley Air's constructive fraud claim appears to flow from Central Flying's alleged
breach of the Southaire-Central Flying Contract. It is unclear whether the Arkansas Supreme

Court would find that a breach of contract can form the basis of a constructive fraud claim. *See Quinney v. Pittman*, 320 Ark. 177, 182-86 (Ark. 1995) (affirming judgment in favor of home purchaser on constructive fraud count based on a breach of contract between home inspector and home purchaser); *cf. Evans Indus. Coatings, Inc. v. Chancery Court of Union County, Third Div.*, 315 Ark. at 704 (a contractual relationship cannot create the necessary relationship of trust or confidence needed to support a cause of action for constructive fraud).

Nevertheless, as stressed by Central Flying and Englert, Valley Air was not a party to the Central Flying-Southaire contract that was allegedly breached. Valley Air thus needs to identify a legal or equitable duty requiring Central Flying and Englert to speak. In an effort to do so, Valley Air directs the court's attention to four Arkansas cases. Three of these cases involve parties who entered into a contract and thus were in privity. Valley Air and Central Flying/Englert, however, are not in privity because the relevant contract that was allegedly breached was between Southaire and Central Flying, and Valley Air was not a party to that contract.[11] *See Beatty v. Haggard*, 87 Ark.App. 75, 77 (Ark. App. 2004) (after entering into a contract to purchase real property with sellers of that property, purchasers sued sellers based on constructive fraud); *Archer Daniels Midland Co. v. Beadles Enterprises, Inc.*, 367 Ark. at 83-84 (hog farm sued its soybean meal supplier after supplier sold the farm potentially contaminated meal which set a chain of events in motion resulting in the death of 2600 hogs); *Quinney v.*

_____

[11]  To the extent that Valley Air had a direct contractual relationship with Central Flying due to contracts between these parties to perform certain work, these contracts dealt with detail work or upgrades to the plane, as opposed to Central Flying's duty to perform a proper Phase I-V inspection and complete repair work identified by that inspection per the Central Flying-Southaire contract. Thus, for the purposes of Valley Air's constructive fraud claim, the relevant contract is between Central Flying and Southaire.

*Pittman*, 320 Ark. 177, 182-86 (Ark. 1995) (home purchasers sued home inspector for constructive fraud based on a breach of an underlying contract).

The remaining case cited by Valley Air involved parties who had an explicit legal duty to each other. *See Downum v. Downum*, 101 Ark.App. 243, 248 (Ark. App. 2008) (wife had legal duty to disclose certain information to husband when providing information to the court overseeing the parties' divorce). Valley Air has not identified the basis for any specific legal or equitable duty under Arkansas law.

Thus, Valley Air's constructive fraud claim is based on the alleged breach of the Southaire-Central Flying contract but it has not pointed to any authority showing that Central Flying or Englert had a duty to speak. The court is not required to construct arguments for a party to allow it to withstand a summary judgment motion. Accordingly, the court finds that Central Flying and Englert are entitled to summary judgment as to Count V.

## III. Conclusion

Southaire and Brunner moved for summary judgment as to Counts I, II, and III. Their motion [#196] is denied as to Count I (breach of contract against Southaire) and Count II (common law fraud against Southaire and Brunner) and granted as to Count III (Illinois Consumer Fraud Act against Southaire and Brunner).

Central Flying and Englert have moved for summary judgment as to Counts IV, V, and VII, but not Count VI. Their motion [#191] is granted as to Count IV (breach of contract under a third party beneficiary theory against Central Flying), Count V (negligent misrepresentation against Central Flying and Englert), and Count VII (Illinois Consumer Fraud Act against Central Flying and Englert).

Thus, the following counts will be tried: Count I (breach of contract against Southaire), Count II (common law fraud against Southaire and Brunner), and Count VI (common law fraud against Central Flying and Englert). A status hearing is set for April 30, 2009, at 11:00 a.m., at which time the parties shall be prepared to agree to a firm trial date and other related dates.

In addition, the docket currently lists Stephen Cosyns as a plaintiff and counter-defendant. The clerk is directed to correct the docket to remove him as a separate party.


DATE: April 16, 2009

Blanche M. Manning
United States District Judge